It's In Re Semcrude L P, numbers 15-3094, 95, 96, 97, 3121, 3123, and 3124. And Messrs. LeClaire and Martin, and Messrs. Maloney and Zalman.  Good afternoon. Lou LeClaire on behalf of 81 producers of oil in Kansas, Texas, and Oklahoma. I have ten minutes allocated for UCC-related issues. I'd like to reserve two for rebuttal, if I could. That's fine, sir. First question, are you going to start with choice of law analysis? Well, I'm actually going to talk about something related to that. Yes, I am. You want to talk about jurisdiction, you mean? No, it's related to choice of law, but I'm going to approach it just a slightly different way. Why don't you start, and then I'll chime in. Very good. What I'd like to do with respect to the questions of perfection and priority and what law governs, I'd like to focus specifically on the question of priority and the question of which law applies with respect to priority. And let me start by saying 9343, the Texas statute, similar to the Kansas statute, unambiguously says that the security interests created by that section have priority. Does that matter if you didn't perfect? It does matter, it does matter, and I'll explain why in just a moment. You have priority over a purchaser who is not a purchaser in the ordinary course of business. So what the statute says is you have priority against someone who is not a purchaser in the ordinary course of business. And what the Delaware law says in 9109C3 is that where a state creates such a statute, the rules of perfection don't matter. I saw that in the briefing. You appear to be relying on commentary in the Delaware UCC adoption, is that right? No, I think it's more than that. I think, Your Honor, it's expressly in 9109C3 that a statute of another state, and this is in our briefs, it's in the STAR brief specifically, a statute of another state applicable to security interests, perfection and priority, that's not governed by the perfection rules of the UCC. In other words, a state can create a lien. Certainly the Delaware commentary says, yes, states can have some variation here, but what are you pointing to? Give me the exact language you're pointing to in Delaware law that you think opens the way under Delaware law for a conclusion that a specialized Texas statute would be the applicable law and not the UCC as adopted in Delaware. I'm relying, we make a bunch of arguments about why, but I'm not going to repeat those or in the briefs and I accept that. But what I want to argue today is 91093 says that if a state creates a statute, a statutory lien as opposed to a consensual lien. I'm trying to ask you, what is the language? Give me the language in the Delaware UCC that you say, not the commentary or editorial, which you're free to do and I'm happy to hear it, but this is the language I'm relying on to make the assertion I'm making right now. The language is, this article does not apply to the extent that a statute of another state, and I'll skip some language, other than the statute generally applicable to security interests, 9109, C3, governing perfection, priority, or enforcement of interest created by the state. So my language is, it doesn't govern our priority that the state of Texas has set forth. And the argument that the other side has responded with, they don't say it doesn't exist, they say it's unconstitutional. And I believe that's totally wrong. If the state of Texas … Well, with respect, they don't just say it's unconstitutional. I understood them to be saying, misread what Delaware law says. I don't think they, if you read their brief carefully, I don't think they say that about this particular argument, Your Honor. That's why I'm focusing on it. They say that about other arguments where we compare provisions of 9240 and other sections, but not this specific argument. Their response to this argument is, you can't do that, you can't create a secret lien, it would be unconstitutional. And what I say in response to that is, that's not so where the state has been very even-handed in creating it and saying that buyers in the ordinary course of business are protected. And I think that's where the law should be. If you compare small producers who don't have paper and large institutions who have paper, and what they're basically saying is, these people have priority unless you're a buyer in the ordinary course of business. And that's where the test ought to be. Mr. LeClerc, if you argue that under the section involving the buyers in the ordinary course of business, does it apply to the defense that's been offered here of the buyer for value? That section doesn't apply to the buyer for value, so even if you're right academically, where does it get you? Actually, Your Honor, I believe what that section does is eliminates the buyer for value defense and leaves them with a buyer in the ordinary course defense. That's where I think the law is, and I think that's what the statutes provide. Mr. LeClerc, is anybody still held? There's many issues on this. There's no law, and this is one of them. This is a first impression matter on this issue and several others. And it's a question for this Court to decide what's the commercially appropriate way for these issues to be resolved. Haven't you asked us on this choice of law question to adopt the federal choice of law principles? Why did I ask you? Haven't you asked us to adopt the federal choice of law principles? That's one of the arguments, and I accept that there's a huge debate about that, and I didn't want to spend time on that today. I was trying to go to something I thought would be more decisive. But I'm not sure how your argument about priority, I know you spent some moments here at Dukes, but I'm just not sure how that gets you anywhere on the choice of law question. Well, it does. If Delaware itself recognizes that another state can create a lien, that solves the choice of law problem for us. That's why it's important to me. I think it works, and it leaves the law where it should be, which is buyer in the ordinary course. Is there anybody, any oil producer that you know that actually went out and filed financing statements? No. No one did, and they wouldn't. These interests are fractionalized. They're spread over thousands and thousands of people. It is simply not reasonable to assume those people are going to file papers. That's exactly why this statute was created, and it should not matter whether the debtor happens to have one entity that's a Delaware entity or one entity that's a Washington entity. Now, the reason it was picked when the code was revised in the late 90s, early 2000s, was to make it simpler, so you didn't have to file in umpteenth jurisdictions. Here, you probably only have to file either in, what, Delaware or Texas? Well, I don't know. As I sit here, all the places that SimCrude had entities, they had one entity in Delaware. They certainly were in Oklahoma. That's where their headquarters was. They probably had Texas entities, so there were probably multiple. They may have had many other entities. But if you're concerned about SimCrude, that would be Delaware. And if you're in, what, the Eagle wing or whatever, that would be, what, Oklahoma? Oklahoma. Okay, so two states as opposed to 30 or 40 or 50. That's true, Your Honor. I'm just saying it is not realistic to assume that people with small fractional interests are going to be in a position to file. I'd like to address briefly, I'm out of time, but I would like to address Buyer in the Ordinary Course of Business. Yeah, and I'd like to ask you something about that. Do you agree or disagree with the assertion that the status of Buyer in the Ordinary Course should be determined at the time of the transaction in question, sale in question? No, I think that's correct. It is determined at the time of the transaction, and I think we can show that there's a fact issue about why they are not at Buyer in the Ordinary Course at that time. And your fact issue is? I think there are three reasons, and I'll just give them quickly. One, the value didn't go to the seller. Yeah, why don't you stop on that. When you say the value didn't go to the seller, you know, were the invoices coming from Semacrude? Sure. The invoices for the oil, the oil was sold to Semacrude. Right. But the payment, the alleged payment, went to Semacrude. Well, at what point in time? Whenever it occurred. Whenever the payments were made, they were made at the time. So they were invoiced from Semacrude and the payments were going to Semacrude. Why does that not then prompt the bankruptcy court and the district court's conclusion that these entities are working hand in glove, they're effectively the same entity? Well, because there's not, there was no proof of alter ego or agency. It's just assumed to be true. We've just talked about what the proof of agency is. One group is selling it, invoicing, and the payment is set up so that it goes to the parent entity. Under those circumstances, what's wrong with the district court and the bankruptcy court's analysis that says it is formalistic to the point of unreasonable to say that that is not an agency or instrumentality kind of a relationship? Because this is a, this whole case is about formalism. That's what this is about, technicalities and formalism. They can't insist on it on the one side and on the other side and say, oh, don't worry about all that. We're all in it together. That doesn't apply to BP. That only applies to J.M., right? I'm sorry? That only applies to J.M., right? Yes, I think it does only apply to J.M. I agree with that. And in that context, the assertion is, is it not, that they're still living within the technicalities of the UCC. They are, they've made their instrumentality argument that our wholly owned subsidiary is doing our bidding and the UCC accounts for that. What's wrong with that reasoning? Because where's the proof? Where's the evidence? How about the course of dealing over the years that, in fact, you're complaining about, that they bought from SemCrude and they paid SemGroup? But the value, the value never goes to SemCrude, who sells. The value only goes to SemGroup. The offsetting value only goes to SemGroup, not to SemCrude. That's the problem. That's the glitch in the whole thing. I thought that that was, maybe we're just talking in a circle here, but I thought the assertion that your opponents were making was the UCC accounts for that. It expects that. It talks about things going to an instrumentality, and that's what's happening here. Well, there's general language, but that doesn't, that, if, can we all just go in and say, well, we're all a big, we're corporate groups, so everything we do crosses those lines? The law doesn't work that way. They have to make a solid proof. They love to rely on the separate corporate entities when it helps them, but now when it doesn't help them, they want to say, oh, we're all just one big happy family, and that doesn't work that way. They have to prove it. What does that instrumentality language mean if it doesn't mean you can act through another actor and still come within the UCC's understanding? If you set up appropriate corporate formalities or you set up an agency relationship and you do all those things. So where do you come up with a fact issue that they haven't had an agency relationship between a parent and a wholly owned subsidiary acting over a long course of time in exactly the fashion you're complaining about? Where's the fact issue that there is not an agency relationship just as they assert? The absence of any proof of the existence of it. This is one where I don't think we have to come forward with the evidence. They're asserting it, and they have to come forward with the evidence. And the evidence they've come forward with is this is our wholly owned subsidiary. This is the course of dealing over a course of years. That's their evidence. So you've said there's a fact issue. I'm trying to get at what your evidence is that there is a fact issue. The fact issue we have is we have separate corporate entities, and the value in one place or another. That's the best we can do. All right. Again, I'm going to get this to Martin, and we'll get you back on rebuttal. Thank you. Good afternoon. Hartley Martin for ISECO. Good afternoon. Do you want to start with questions? No, I'm actually good afternoon. I mean, I could, but that's okay. I will not. In 1992, Oklahoma created a statute called the PRSA, Produce Revenue Standards Act. And in that act, they created a section which was designed, we believe, to protect operators such as ISECO. Go ahead and straight the Gaskins then, okay? Straight the Gaskins. Gaskins just didn't even consider the New Lean Act of 2010. Assume that that's right, it didn't even consider it. Right. Why wouldn't we, looking at Oklahoma law, say to the Oklahoma Court of Civil Appeals, you don't know your own law. Why wouldn't we take the Oklahoma Court of Civil Appeals as a better source of understanding than, with all respect, attorney argument about what the law means? Well, I guess there are a couple of reasons for that. I don't know that they were even asked to consider the 2010 statute. Did they adopt the bankruptcy court's opinion, in effect? Did they adopt it? Yeah, did they look to the reasoning of this bankruptcy court and found it persuasive? As did Nader Farns and McKnight, right? They did as well, but I think it was Nader that the first opinion found that Shana was wrong. And then on a rather empty motion for reconsideration, the court decided that the bankruptcy court was right. So that goes both ways. There was also a case, Foster v. Miller. I mean, it goes both ways, but in the end they're saying that they sided with what Judge Shannon had done. Yeah, but in Foster v. Merritt, the Western District of Oklahoma found that there was a trust, sided against Judge Shannon. How far down the line of commerce does the PRSA's implied trust continue? I think it goes to the purchaser. For what? The purchaser. I think it goes to the J.A.R.N.s of the world. And I say that because of the 2010 statute. So if J.A.R.N. sells it to Smith Inc., it doesn't go to Smith Inc.? Or does it just keep going? Well, I have difficulty believing it goes beyond that because even the new act seems to limit it to purchaser. How does it get beyond Semcrit? Yeah. How does it get even beyond Semcrit to get to J.A.R.N. and BP? Well, because although Judge Shannon said the word person means operator or royalty owner, in the act they say any person, which is a very broad term. Nowhere else in the statute are they talking as broadly as person. And let me say one more thing. It gets beyond at least the first purchaser because the first purchaser has a safe harbor even in the original act of 1992. So we know it gets past them because they have a safe harbor. Why would it stop at J.A.R.? I think just in terms of knowledge, I think at some point the J.A.R.N.s of the world are buying this directly from an amalgamator, from Semcrit. So they know that Semcrit didn't produce this oil. They bought it. But they also got a certification from Semcrit that they're getting it free and clear. They got it from Semcrit, but they didn't get it free. I understand. But from their position, how does commerce in your world, it seems that the consequences, if we adopt your argument, are going to be a complete bottling up of the oil and gas industry. In other words, you have to be able to, this goes back to Judge Easterbrook and others, you have to, in commerce, when you buy, you've got to be able to buy free and clear. Otherwise, commerce can't function. Well, I suppose that's true, but lien acts do this all the time. They call them secret liens if the paper's unfound, if it's automatically defecting. And we see this in PACA, in the federal situation, and under the PACA, this happens all the time. There is a case out there that says an electric company has to discourage funds that they took that were proper. But the PACA is a federal statute. It is a federal statute. I'm just saying, when you ask me how it's not gumming up the works, I'm saying that in the oil there are liens, and including the new Oklahoma lien, which very clearly goes beyond the first register to the purchaser. Ken, can I ask, like, take a step back. Your opponents have made the argument pretty strongly that you don't have any right to make this argument at all, that you waived it, that you said, quote, ICCO has never contested and does not now contend that the Oklahoma Production Revenue Standards Act creates a trust of any kind, unquote. Why is that not a straight-up waiver of this argument? I wrote that. So let's hear how you're going to unwrite it. Well, no, I wouldn't unwrite it. We're defending the trust claim. Jay Aaron sued ICCO on a trust claim. So when you ask me, how dare you, in effect, well, they sued us. So they sued you, and you said, hey, we've never ever said, and we are not saying now that this creates a trust of any kind. We're not saying that. So why is the fact that you are asserting in that context, vehemently, there's not a trust created under the statute, not something we should pay attention to when you're here before us today? I mean, I understand then was then, but we're in the classic what's different. How come we should hear you to be saying quite the opposite now? The way it all was written, there was already a stipulation in place that gave us the ability to appeal the 2009 bankruptcy court decision, finding that there was no trust. So we knew already that we had a right to that. But what do these words mean? I'm trying to get at the meaning of these words. These words seem to mean we are not now, and we never have asserted that these things are a trust. And now you're saying, oh, they're a trust. Those seem incompatible. They do. And I do understand and wouldn't forcefully disagree. I don't think the trust argument is a strong argument. I do think that there are obligations created under the PRSA which impose duties on companies like J. Aaron. Now, whether that arises to a statutory tort, which is a vehicle used in Oklahoma where a statute creates a duty, a known common law where there's no contract, but it's a duty on a person, if there's a breach to the duty. Wait a minute. Is there anything in the PRSA that's directed to downstream purchasers? Isn't it really between the various interest owners and operators of the wellhead? No, on the first purchaser. I mean, the first purchaser in 570.10C gets a safe harbor if he pays the operator. So at least the first purchaser goes there. And then in 2010, they extend that to purchasers. It just all predates 2010. Yes, it does. So there's no safe harbor for the purchaser. We'll hear from the other side, and then I think we'll get Mr. LeClaire back. Thank you. Thank you. By the way, while you're getting ready, the reason I'm trying to keep semi-close to the timeline is I have something coming up later this afternoon, and I usually, my colleagues get upset with me because I usually ignore the red light, but today I can't, unfortunately.  Let me start with the 9019B3C3 citation. Can we get you to identify yourself for the record? Yes. Let me start by saying good afternoon, Your Honors. It's Tom Maloney for the record, representing J. Aaron and Company. And I have my colleagues hand me the Delaware UCC, so I could follow up. Can I just start off by asking a factual question? Sure. Is CEM Group in the business of oil and gas? Yes. Now, it's a parent. Yes, the parent company is also in the business of oil and gas. And what evidence did you put in to show that? We showed, and we have it in our brief at page 10, footnote 13, and also in the record at 9377. There are two places where you can look in the record, that this proposal was set up where we dealt with CEM Group directly, rather than CEM Crew directly, was something proposed to us by CEM Group, and that it was the same arrangement they had with ConAgra for many years. How does that meet the argument that we've heard from Mr. LeClair? I understand the argument we're hearing from the associated producers to be they don't get to play this corporate shell game where, hey, we're all separate, we've got to respect the corporate veil between us here, and then when it's convenient, say, we're all one big happy family, don't get overly formalistic on us. You chose to give your money to CEM Group for whatever reason. For a good reason. There's a formality here that runs against you. Why shouldn't you be held to live with that? That's their argument to us. What's wrong with that argument? I'm saying that the reason we dealt with CEM Group, they proposed we deal with CEM Group, it made perfectly sense, because we're going to deal with CEM Group as an umbrella company for two oil companies. How does that answer their legal point? It doesn't matter whose idea it was. Their legal point is, whosever idea it was, CEM Group is not CEM Crew, and CEM Crew is not CEM Group, and the money went to CEM Group, and that's not money going to the seller, and therefore you can't meet one of the elements of buyer in the ordinary course. That's their argument, and that's the thing you need to meet. Okay, let me deal with two technical arguments. One, verse 9-3-1-7. For that purpose, it doesn't matter who we paid it to. Homebook law, but we paid it to the parent or subsidiary, no matter who we contracted with, that would be value under the UCC. So from 9-3-1-7, it doesn't technically matter at all. From 9-3-20, we're saying that they're making the argument, there's no question, our contracts were with CEM Group, that's in the record. The invoices from CEM Crew paid to CEM Group, that's in the record. Our netting arrangements were with CEM Group, that's in the record. Our derivative trades were with CEM Group, that's in the record. So we concentrated all of our activity. CEM Crew, it's also in the record, obtained the oil by intercompany transfer from its wholly owned subsidiary, CEM Crew, that's in the record. There's nothing unusual about that transaction. Where'd the money go? The money went to CEM Group. Okay, and that's their argument, and that's the argument you need to make. Their argument is a very specific legal technical argument. I understand, but CEM Group was our seller. On our document of sale, CEM Group was the seller. CEM Group bought the oil from its own subsidiary, brought it to company transfer, and sold the oil to us. Yeah, but what I can't understand, why did Aaron contract with CEM Group for the oil assets while BP contracted with CEM Crew? I think BP thought they made a mistake and worried about the possibility of the three-part set-offs, which are sometimes not recognized, and I think the structure Jay Aaron did was a more prudent and more commercial structure for financing this business in that point in time. It was the same one that was followed by ConAgra, and admittedly BP and one other party used a different structure and negotiated directly with CEM Crew. Does that mean there are questions of fact here, Mr. Maloney? I think they know all the facts. That they did certain things with you, they did certain things with BP, who knows whether it went to CEM Group or CEM Crew? Are there factual issues that should have had a trial? No, because all the facts were right before Judge Shannon. He lived through this case, he knew all the facts, all the invoices were before him, all the payments were before him, all the transactions were before him, and these are not unusual commercial arrangements. That this company was in the business of netting, this was a reasonable commercial arrangement by Jay Aaron, taking into account the issue of triangular set-offs, taking into account the difficulty of having a multiple set of netting arrangements with two different oil companies, Eagle Wind and Yammer. Was it possibly the idea that you had derivatives with CEM Group as opposed to CEM Crew, or is that not true? CEM Group did all of the derivative trading with both of us. Did CEM Crew do any derivative trading? CEM Crew? CEM Crew. No, I believe it was CEM Group who did all the derivative trading. But did CEM Crew do derivative trading even with others? I don't believe so. I believe they concentrated all of the derivative trading. So all of the derivative trading went through CEM Group? Yes, there could be an oddball exception, but I think in general, based on my knowledge of the record, I believe that the derivative trading was with CEM Group, the oil trading was with CEM Group, but they're all part of the same corporate family owned by a single partnership. There's a partnership umbrella company, there's a holding company to facilitate these types.  There's no reason for the structure but to do these type of transactions, these master-net agreements, which you do with Conagra. It was a huge trading partner. Makes perfect sense. Their argument is, who cares whether their setup makes sense or not? The question is, does it meet the definition by statute of buyer in the ordinary course if the sale, that is the product, is coming from one entity and the money is going to another? You know, they drew a little chart and they replied very helpfully. You know, one example I tell people is, you know, when we wrote the briefs, my colleagues, my associates wrote the brief. You don't see my name on it. I mean, you ask me, am I in the business of law and writing briefs? Yes. Did I write the brief handily? No. Some of my associates did. You know, you can always act from subsidiaries or agents, and you're still in that business, right? 9320 doesn't ask who writes the briefs. 9320 says that the entity has to be in the business. And that's the reason why my first question was, is CEM Group in the oil and gas business? Yes. If you ask the President of CEM Group what business you're in, what answer do you expect to get? I'm in the oil and gas business. If you ask any employee of CEM Group what business you're in, they'll say they're in the oil and gas business. Whatever business would they say they're in? All they did was trade oil and trade gas. How about if you asked somebody else besides the officers of CEM Group? If you asked anyone who dealt with them, what does CEM Group do in terms of their business? They'd say they're in the oil and gas trading business. You look at the newspaper reports. You look at their annual reports. You look at their SEC filings. What about Wikipedia? What would they say? I bet they would say they're in the oil and gas business. That's right. I bet if you look at it, they would say they're in the oil and gas trading company. Could I ask? I'd like to ask you a question, a choice of law question. Yes. Obviously, Mr. Leclerc spent a lot of time on the choice of law issue. Maybe the question I'm asking is similar to what he argued on 9-109 and the priority, or 9-343 on the priority issue. Isn't there a state law interest here in the state of Texas whose purpose is to protect Texas royalty owners and producers? How can that state law interest be ignored and shouldn't it be considered in determining the choice of law? I think there is a state law interest, and I'll tell you how I think it should be considered. The state law interest is those thousands of people he talked about, the working interest people. These statutes actually protect those people, all of these statutes. The Oklahoma statute, the Kansas statute, and the Texas statute actually protect all those working interest people versus operators. In a national system, that's the legitimate Texas interest. When you're dealing with a commodity, oil, that flows across the entire United States, which is purchased throughout the United States. You're dealing with a commodity. Everyone has a strong expectation it's going to be a negotiable commodity. Texas interest does not extend to a secretly enacted commodity. When you say secretly enacted, the pushback from them is there's nothing secret about this. It's on the statute book, and people understand it, and the fractional interests involved are such that people in the ordinary course, to use that phrase again, all know that nobody is going to run and file every time they tell or buy one of these things. That's why the statute exists. That's the argument they're making. Why are they wrong about that? Why give you answers to that? Don't we override the interest of the state of Texas deliberately intended to meet this need by following the line argument you're proposing? I'll give you two answers. All they had to do, and I'm talking now about the larger producers who were the ones who were before us today, not the small working interest holders. All they had to do was to a filing in one of two states, Oklahoma or Delaware. That was it, a single filing, a single simplified filing. Someone like Jay Aaron, of the oil we received, we have no idea whether it came from these people. Yeah, but you knew, and there's debate obviously about what was actually put in the record, but it seems clear to me from the record that you knew at least some of this oil that you were getting from Sem Group came from the state of Texas. No. In fact, none of the oil actually came from the state of Texas. That we do know. The bankruptcy court never reached that issue. But we do know from the affidavit put in by the person who was the expert hired by the debtor to do the work for the debtor, that none of the oil we received came from the state of Texas, zero. But that wasn't determined in the bankruptcy court. No, but what the facts were, we bought oil from two large aggregation centers. What the facts are, there were 11 million barrels of oil sold in that period. Only 3 million of those barrels came from the so-called first purchasers. The other 8 million barrels either came from bulk transfers or came from second purchasers, because they were buying from aggregators, they were buying from marketers, they're buying from... That seems like a question further on down the line. I'm just saying we also knew in those three states that they had $6.4 million of storage capacity. You've got to stop talking. You're right, you can answer a question, but if I try to intercede, you do have to stop. I will. There's a priority. We get a priority. I understand that. It's not by Texas statute. You get the priority, Your Honor. Okay, it's our choice of law. It should be around my dining room table. Nobody follows that. I don't wear a robe at the dining room table. I did. My wife would kill me. But it just, I lost my train of thought here. I'm sorry about that. You're telling me, Your Honor, that the court didn't make those specific findings. Yeah, the court didn't make that specific finding, and I guess my question goes in the same thing that Judge Jordan uttered. There's clearly a state law interest here. And there's state law interest in Kansas. There's state law interest in Oklahoma. The Texas state law interest seems to be somewhat different, and they had the automatic security interest perfection. Now, does that or should that factor into the choice of law? Because when I look at what happened here, the bankruptcy court chose, said that the location of Sem Group's place of business was either Delaware, where they were incorporated, or Oklahoma, where their main office was located. But yet the Texas producers say, wait a minute. We sold them oil, gas, and that was in Texas, and Texas has a certain statute. Your Honor, I think I'm glad you pushed me forward because I have a better answer for you than the one I gave before, which is the Texas legislature has spoken on this issue. And it also answers the other question they raised about 9109. Because when they looked at 9109C3, they didn't quite read it to you completely. It says a statute of another state, a foreign country, et cetera, other than the statute generally applicable to security interests, that even though this is a special section in Article 9, it's in Article 9. It's a statute dealing with security interests. It depends. They deliberately, in order to avoid a problem they would have in the bankruptcy court with new laws not being enforced, deliberately went for the mechanism of deeming a security agreement being created by certain things so it would be a contract dealing generally with security interests and enforceable in the bankruptcy. That was a concern of the Texas legislature. If you look at the Texas legislature's choice of law provisions, which are exactly the same as Delaware's choice of law provisions, they would tell you you have to file in Oklahoma or Delaware to perfect a security interest. That's what the district court held. Deferring to Texas and looking at the choice of law rules that they incorporated in Article 9 of their statute and the fact that they held that this was not a self-contained provision because by its terms it incorporates the other provisions of Article 9, they found that Texas had basically made a judgment. What about comment 7? What about the comment, I think it's comment 7 in 920. The comment 7 basically says that we're going to have to look, we're not answering that question in 920 as to what law applies for new laws. It doesn't say you go look at law. It says you've got to look elsewhere to find the answer. I think where you find the answer is going through the kind of complex choice of law analysis and correct choice analysis that both the district court and the bankruptcy court went through. It starts out by saying sitting in Delaware you're going to apply Delaware choice of law. It's a false conflict because the UCC statutes of all three states all then look to the law of the state of incorporation for perfection and under that law of perfection they fail to perfect in any of those states. So I think that. At this point, since I've caught up the other side, I'm going to have to do the same here. If you've got 30 more seconds and then we'll get Mr. Zalman. Okay. I just want to make a point about the complete bottling up argument, which I think a covered copy, which you raised, Judge Ambrose, which I think if you look at the record at the affidavit from Conoco at 9731 to 9734, it basically says that if any of these statutes really are given the broad reading they ask for, the oil industry cannot function. And I think the logic is compelling, and I ask the court to look at that. Thank you. Thank you very much. Mr. Zalman? He has four minutes. Good afternoon. David Zalman for BP Oil Supply Company. I only want to address certain undisputed facts that are specific to BP and which confirm that the lower courts appropriately dismissed the producer's claims against BP, albeit on grounds that the lower courts did not specifically address. The producer's claims are all premised on the incorrect assertion that BP did not pay Stemcrude for oil that BP purchased. But the undisputed evidence conclusively shows that the producer's factual allegations are simply wrong. They're simply inaccurate. BP, in fact, fully paid for the oil in both cash and oil and did not offset any derivative trading debts. Notably, the producer's reply brief doesn't address a single argument in our opposition papers, and it therefore appears that the producers no longer contest that BP was a buyer on the ordinary course. First, I should note that the only oil at issue is oil which BP purchased in June of 2008, and that's because the producers received full payment for oil delivered to Stemcrude in July through their settlement with the debtors. So we're only talking about June oil, and the following facts are undisputed with respect to BP's dealings with Stemcrude. Well, aren't there disputes of fact about what BP knew about Stemcrude's financial condition? No, Your Honor, and you guys are on the same page as the Associated Producers and others when they say you guys were all clued into the fact that Stemcrude was on the ropes. But I think even if BP knew that Stemcrude was having financial difficulty, and I don't concede that we did, I don't believe that that raises any factual issue with regard to the buyer on the ordinary course defense. Doesn't the buyer on the ordinary course defense require that the buyer take without knowledge of other leads or claims? No. The buyer on the ordinary course defense requires that the buyer lack knowledge that the sale violated the producer's alleged rights. Remember, the buyer on the ordinary course defense is distinct from the buyer for value. Under the buyer for value defense, the standard is whether there was knowledge of the existence of an unperfected lien. On the buyer on the ordinary course defense, the standard is whether we're assuming that there is a perfected lien. Obviously, we don't concede that there was, but for purposes of the analysis, we're assuming that there was. And the standard is simply whether BP knew that the sale violated the producer's alleged rights at the time of the sale. Right. And their argument is there are fact issues about what BP knew that will undermine their claim of good faith and lack of knowledge because they had awareness that these people couldn't possibly make those payments. They couldn't meet on the timely schedule the stuff that was being brought to the floor. I'm sure I haven't done this as neatly as they have, but those seem to be disputed facts. Are they not disputed? Well, I don't think they squarely address good faith in their brief, but let me just address, I mean, the fact is that BP did in fact pay Semcrude for the oil. It had no way of knowing at the time that BP paid Semcrude in cash 100% for the oil. It had no way of knowing that a month later or rather six weeks later, Semcrude was not going to pay the producers. That's, yeah, get us to the point where we could say there's no way, right, because their argument is there is a way. You were aware. When you say there's no way we could have known that there were red flags going up about Semcrude's trading action and its behavior that should have and actually did put you on notice. So when you say there's no fact issue, I'm not sure you advance it by saying there's no fact issue. What is it that you were relying on? The knowledge that's required under the statute is a lack of knowledge that the sale violated the producer's rights, that the actual sale violated the producer's rights. Would it have violated the producer's rights if they failed to pay the producers in a timely fashion? I suppose it would, but that has nothing to do with the sale of oil to BP. BP purchased oil. BP paid for that oil. Dollar for dollar, no derivative trading. The producer's allegations are premised on the argument that this cross-product netting is somehow outside of the ordinary course and that BP and Jay Aaron somehow knew that by engaging in these transactions that Semcrude was going to be left and the producers were going to be left holding the back. But my point today here is we didn't offset any derivative trading debts with respect to the only oil at issue. We entered into confirmations with Semcrude in February and May of 2008 for delivery of oil in June. Pursuant to those confirmations, in June, Semcrude delivered $135 million worth of oil to BP. Excuse me, BP to Semcrude, or Semcrude to BP, I'm sorry. That same month, BP delivered to Semcrude approximately $104 million. BP's contracts with Semcrude permitted the parties to net out physical oil trades, which the producers admit is standard and customary in the industry. So BP owed Semcrude a net amount of approximately $31 million, which was the difference in value between what the parties had delivered to one another. And BP fully paid that amount one day before Semcrude filed for bankruptcy without offsetting any derivative trading debts. And so in light of these facts, we think it's plain that BP is the buyer in the ordinary course. And I should note for the record that 100% of our trading activity was with Semcrude. So the argument that the producers have made related to Semcrude did not apply to BP. Unless the court has any further questions. Thank you very much. Thank you. I will be extremely brief. Gina, why don't you put four minutes on instead of two? I won't even take that, I don't think. I want to say just three or four quick things. As to 9109C3, the argument was that's a statute of general applicability to security interests. Wrong. It is a very specific statute for interest owners, so that argument is incorrect. And this statute does apply, and the interest should be taken into account in deciding what law should apply. Second, this will stop up commerce for heavenly days. If you have a buyer in the ordinary course, it is accepted from this. It is very reasonable for the Texas legislature to say, we will give you priority over someone who is not a buyer in the ordinary course of business. And that is not going to stop up commerce. So the ordinary course takes precedence, so you are basically giving up your argument against BP? No. BP, look, the argument against BP is much, much tougher. And a lot of what he says, factually we agree with. But there is an argument against BP, which is in the briefs, that they took this oil as security. And their executive vice president testified, we were a highly compensated secured lender. That's what they were really doing. That was their intention, whatever the documents say. They have, they're given money and they're taking oil. That sure looks like a purchase. It looks like they're giving a new value. It doesn't look like security interests. I will grant you, this is a unique, I will absolutely agree with you, Your Honor. This is a tough situation. When someone can get security by buying a commodity, it looks like a trade of oil, but it's really for purposes of security. That's why they did it. Wait a minute, you lost me. Just logically, if you, how do you get security in something from somebody else when you own the property that the other party purportedly is giving you security in? It don't make enough sense. Okay, well, I'm going to make the argument as best I can. And I will tell you, Your Honor, this is, there's no case on this. It's a difficult argument. But the issue is, if I want to take something as security, but it turns out it's a fungible, marketable commodity, it doesn't matter whether I give it back, which is the standard situation. I take the forklift and I hold it as collateral. And then when I don't need it anymore as collateral, I give it back. Right. But when you have a fungible commodity, you just buy it and you own the money and you just continue to roll your debt. And then whenever you need it, you just pull the ripcord and take the security. Isn't the answer to that then too bad for the associated producers? Because if something is bought and purchased and you own it, even if in a sort of a metaphysical sense, oh, I can think of this as a security, you own it, and so you own it. And it's not security in the eyes of the law. You bought it. I mean, I understand your thinking, which is, hey, but they're really holding it for security. But the law doesn't tell us to say, what were you really thinking of? The law says, did they own it or not? They owned it. The only question, and I don't want to debate it because I understand exactly what you are saying and I can understand the argument that way. All I'm saying is, is it fair to look at the intention? And that's my question. Let me get to two quick things. The argument about value going to the wrong entity, and the argument was made, all this was sold by Sim Group. In the record, A1719 is an invoice from Sim Group to Jay Aaron. So it's not all sold. I just happened to be able to pull that one right off the top. But weren't all the invoices from Sim Group? Or weren't all the invoices from Sim Group to Jay Aaron? Well, no. I think what he was saying, the argument was they were all from Sim Group. And then I'm saying, so we have a fact issue, a big fact issue about who sold the oil. I thought the invoices were from Sim Group and some of the payments went to Sim Group because of the derivative activity. That's what we say. And that's why there's a value disconnect. And I'm saying their argument was, no, it was sold from Sim Group to Jay Aaron. And I'm saying that's factually, there's a big dispute in the record. Fact issue. Final point, tracing. We came up with this, oh, we didn't give them the oil. Believe me, you talk about fact issues. There's a whole other affidavit from Tittle all about that. So I think that's just simply another fact issue, Your Honor. Thank you very much. I would ask counsel if you could get together and have, with the cook's office, and have a transcript prepared of this oral argument and just split the cost. That side half, that side half. Thank you very much. I'm sorry. I find this subject fascinating. I wish that could have gone on for another hour. I mean that. It's a privilege having you here. Am I going to have Mike do this? You had four minutes, not five? I had five. And you took five? No. You were up your seven. Three quick points. All right. I promise they'll be very quick. Okay. I know the issue has arisen about the whole language of we disclaim trust. The only motion the summary judgment filed claimed that there's no trust. So the language was directed at, well, we're not making a trust claim here. Our affirmative claims are these other claims, are the statutory claims or the other duties. That's where that's from. And if you look at their motion for summary judgment, you'll see they didn't address statutory or anything else. The second answer I want to give you is under 549.6, which is the new Lean Act, under A1 they have now a buyer in the ordinary course defense. So for the concern that this is going to down the road somewhere, affect the gas station who thinks they're buying a product and it has never been paid for, that's already been taken care of by the new legislation, which also says that purchasers have a duty. That we understand. Okay. Finally, let's see here. The other argument I want to tell you about with relation to the trust is the Associated Producers have joined our brief. So even if you don't think that we're entitled to relief, that's still an issue. And disregarding the mid-level appellate court, the local county courts are permitted to disregard these mid-level courts. And we explain why in our brief the ad hoc nature of them. I want to make sure I understand. You're saying that if we accept that you're blocked from making the statutory trust argument, the constructive trust argument, that because the Associated Producers said, yeah, we like their argument on that point, they're entitled to make it? Well, they joined in the brief, yes. And as I said, even a county court can completely disregard these mid-level appellate courts. I mean, it's above my pay grade, but this is the Third Circuit. Thank you. Thank you very much. We'll take the matter under advisement. Thank you very much for being here today. Please rise. This court stands adjourned until tomorrow, Wednesday, April 5th at 11 a.m.